NORTHWESTERN STEEL AND WIRE COMPANY, Plaintiff-Appellant, *v.* THE DEPARTMENT OF REVENUE, Defendant-Appellee.

Third District   No. 3—82—0806

Opinion filed December 21, 1983.

462

Hamilton Smith and John J. Jawor, both of McDermott, Will & Emery, of Chicago, for appellant.

˜ ˜ Neil F. Hartigan, Attorney General, of Springfield (Rosalyn Kaplan, Assistant Attorney General, of counsel), for appellee.

JUSTICE BARRY delivered the opinion of the court:

Northwestern Steel and Wire Company appeals from a judgment of the circuit court of Whiteside County in favor of the Department of Revenue of the State of Illinois entered in an administrative review proceeding in which Northwestern challenged the amount of tax applicable to gaseous oxygen supplied by Union Carbide to Northwestern's steel mill in Sterling, Illinois.

In 1971 Northwestern entered into an agreement with Union Carbide whereby Union Carbide would install an oxygen supply facility on land leased from Northwestern, and Northwestern would purchase oxygen as needed for its steel mill. The contract referred to Union Carbide as "Seller" and Northwestern as "Buyer." Pursuant to the terms of the agreement, Union Carbide installed oxygen facilities near Northwestern's steel mill premises. The oxygen plant converts the air surrounding it into gaseous or pure oxygen by removing nitrogen, argon, moisture and impurities from it. Gaseous oxygen is stored in two tanks which are part of Union Carbide's oxygen supply system.

The oxygen used by Northwestern is withdrawn from the tanks and piped to numerous outlets throughout the mill. When a cutting tool is connected to an oxygen outlet in the mill, the oxygen is ignited, creating an extreme heat which is concentrated on the material to be cut. The oxygen plant operates automatically. When a Northwestern employee turns on a valve at an oxygen outlet in the mill, thereby withdrawing gaseous oxygen from the storage tanks, the plant automatically produces and feeds into the storage tanks new gaseous oxygen to replace that which was used. Activation of the plant is controlled solely by Northwestern.

Liquid oxygen is used as a backup supply in the event of a breakdown in the oxygen plant generators or in the event of a demand on the plant that is greater than its capacity. Liquid oxygen is trucked from Chicago by Union Carbide and placed in special storage tanks which are part of the system. If Northwestern's usage exceeds the maximum capability of the oxygen plant to generate oxygen from air,

the plant automatically converts liquid oxygen into gaseous oxygen and adds the gaseous oxygen to the appropriate storage tanks.

The agreement with Union Carbide provided for Northwestern to pay a facility charge of $26,886 per month whether any gaseous oxygen is delivered in a given month or not, and also provided for no payment in addition to the facility charge for the first 20,000,000 cubic feet of gaseous oxygen delivered in any month. Northwestern also had to pay an additional charge per cubic feet for liquid oxygen used when required by increased demand. Union Carbide is required to maintain the oxygen supply system and during maintenance shut downs of the oxygen-producing part of the system, Union Carbide must furnish the liquid oxygen as needed.

After Northwestern completed construction of a new 14-inch mill in 1975, Northwestern and Union Carbide entered into a new agreement by which Union Carbide would provide a liquid oxygen system with storage tanks and vaporizing equipment to convert liquid oxygen into gaseous oxygen. For this system Northwestern purchased the liquid oxygen, and Union Carbide trucked it to Sterling. This new facility is also totally automatic. The agreement required Northwestern to pay a facility charge of $1,025 per month plus a cubic foot charge for the liquid oxygen purchased from Union Carbide. Due to unfavorable business conditions, the new mill operated only six out of 26 months between May 1975 and June 1977, but the facility charge was paid every month.

The Illinois Department of Revenue conducted an audit during 1977, as a result of which Northwestern had to file an amended use tax return for the period from January 1, 1974, through June 30, 1977, and pay in excess of $82,000 taxes, penalties and interest. In November of 1977 Northwestern filed a claim for credit for the full amount paid. Northwestern based its claim for credit upon the assertion that the facility charges were rent payments, not part of the cost of the oxygen sold, and also that a use tax should not be imposed on the amount of gaseous oxygen transferred in excess of 20,000,000 cubic feet per month. That claim was denied. After a protest and an administrative hearing before a hearing officer, the claim was again denied.

After having exhausted its administrative remedies, Northwestern filed a complaint for administrative review in the circuit court of Whiteside County, and following a hearing, the trial court ruled that plaintiff does owe a use tax on the gaseous oxygen produced from the air under the 1971 agreement, but not on the gaseous oxygen produced from liquid oxygen under both the 1971 and 1975 agreements

since Northwestern had already paid a use tax on the liquid oxygen when it was purchased and was not required to pay a second tax. This ruling eliminated the Department's claim as to oxygen supplied under the 1975 agreement, and reduced the claim as to the 1971 agreement, resulting in a credit of $1,586.62 against the use tax previously paid. The trial court also ruled that the facility charge is a part of the cost of the product.

Northwestern has appealed from the judgment of the circuit court, asserting (1) that gaseous oxygen is not tangible personal property within the meaning of section 3 of the Use Tax Act (Ill. Rev. Stat. 1977, ch. 120, par. 439.3); (2) that no transfer of gaseous oxygen from Union Carbide to Northwestern occurred; and (3) that the facility charge was rent and not part of the charge for transfer of ownership of gaseous oxygen. An integral part of Northwestern's argument on these issues is its contention that an earlier decision of this court, *Keystone Consolidated Industries, Inc. v. Allphin* (1977), 45 Ill. App. 3d 714, 359 N.E.2d 1202, should be overruled. We do not agree, and we believe *Keystone* to be controlling in the case at bar.

Before considering the merits of Northwestern's contentions, we must first acknowledge the Department's assertion that Northwestern is attempting to raise the question of whether gaseous oxygen is tangible personal property for the first time upon appeal and that we should treat the issue as waived since it was not argued in the trial court or in the administrative proceedings. The briefs of the parties filed in the trial court are a part of the record, and they indicate that Northwestern's arguments assumed that gaseous oxygen is tangible personal property. Shortly before the trial court hearing, Northwestern did raise the issue of whether gaseous oxygen is tangible by means of a letter to the trial court. Presumably the trial court considered that issue (as well as the other issues) to have been disposed of by the decision in *Keystone* where this court stated: "The gases [oxygen and nitrogen] are tangible personal property and as such are subject to the use tax." (45 Ill. App. 3d 714, 718, 359 N.E.2d 1202, 1205.) We do not believe the issue was in fact waived in the trial court, and in any event, in the exercise of our discretion, we choose to discuss this issue.

Northwestern submitted the appeal briefs from the *Keystone* case to the trial court, and they are included in the record on this appeal. On the basis of those briefs, Northwestern asserts here that the issue was not argued in *Keystone* and that, we there did not have the benefit of the authorities cited herein by Northwestern, and therefore we reached the wrong conclusion in *Keystone*. We believe that point is

not well taken and overlooks the rather obvious fact that appellate courts frequently do research beyond the briefs submitted to them, and sometimes of necessity rely upon authorities not cited by the parties to the appeal. We must, therefore, decline to presume that we erred in deciding an issue overlooked by the parties to an earlier appeal.

At this time we have considered the authorities cited by Northwestern. In addition, we think it important to note that one of the most elementary scientific principles is that gas is one of three forms of states of matter—the other two being liquid and solid. The primary authority relied upon by Northwestern is *Farrand Coal Co. v. Halpin* (1957), 10 Ill. 2d 507, 104 N.E.2d 698, where the Illinois Supreme Court considered the meaning of the phrase "tangible personal property" in the context of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1955, ch. 120, par. 440 *et seq.*) in a case involving the taxability of electrical energy. The court first stated with approval the law definition from Webster's dictionary of "tangible" as consisting of or pertaining to matter or a material body, and then discussed the *indicia* of tangibility as gleaned from the testimony of expert witnesses:

> "From the evidence it appears that although energy and mass are closely interrelated, indestructible, equivalent, interchangeable, directly proportional to and may be equated with each other, yet energy as such cannot be separated from mass or matter and stored, weighed, transported, handled, liquified, solidified, photographed, touched or otherwise perceived by the senses in its own right or capacity separate and apart from mass or matter. All witnesses who testified on the subject, including plaintiff's witnesses, agreed that energy cannot be separated from matter and tagged or otherwise physically identified in any way, cannot be located spacially, and does not have dimensions. *In all these respects energy falls short of fitting into the ordinary and popularly understood meaning of the word 'tangible' as used by the General Assembly in the act in question.*" (Emphasis added.) *Farrand Coal Co. v. Halpin* (1957), 10 Ill. 2d 507, 511, 140 N.E.2d 698, 700-01.

■ If we use the same test here that the supreme court used in *Farrand* to determine tangibility, we find in the record of the instant case that oxygen can be separated from other mass or matter, it can be stored, transported, handled, liquified, physically identified, located spacially, and does have dimensions. The contract entered into between Northwestern and Union Carbide provides for the separation of oxygen from the air and for its storage, transportation, and handling.

Frequent reference is made to cubic footage of gaseous oxygen, thereby acknowledging that it is capable of being physically identified, located spacially and measured. The contract provides for the use of liquid oxygen, thus demonstrating that oxygen is matter which can be converted to another state. The fact that oxygen cannot be "touched" in its gaseous state is not the controlling factor. While gaseous oxygen is colorless and odorless, and thus invisible, it is matter, nonetheless. Additionally, we have found no evidence that the Illinois General Assembly intended to exempt from use taxes all sales involving the transfer of property in a gaseous state. We again hold, as we did in *Keystone*, that gaseous oxygen is tangible personal property subject to the use tax.

■ Northwestern also contends that tax liability was improperly imposed here because no transfer of oxygen from Union Carbide to Northwestern took place. This argument is based upon three factors: (1) that neither Union Carbide nor Northwestern owned the atmospheric air surrounding the oxygen facility, and that neither one owned the oxygen in that air so there was no transfer of ownership possible; (2) that the process of converting air into gaseous oxygen is a process of elimination of impurities, like filtering, so that nothing is added to the air; and (3) that the oxygen facility was entirely automatic so that employees of Northwestern actuate the production when they open the valves in the mill. From these facts, Northwestern suggests that Union Carbide supplies a service, not a product. The first two factors were present in the *Keystone* case where Keystone purchased both oxygen and nitrogen from a plant constructed by Chemetron on the premises of Keystone's steel and wire plant in Peoria. There we analyzed the language of the contract and held:

> "We find that the clear intent of the parties, as indicated by the plain language of the contract is for Chemetron to produce and sell and Keystone to buy the oxygen and nitrogen needed by Keystone. Once oxygen and nitrogen have been separated from the atmosphere, they become valuable commercial products capable of being sold and taxed, and are so treated in the contract." *Keystone Consolidated Industries, Inc. v. Allphin* (1977), 45 Ill. App. 3d 714, 718, 359 N.E.2d 1202, 1204.

In the case at bar, as in *Keystone*, the parties refer to themselves as "Buyer" and "Seller" and refer to the gaseous oxygen as the "product." The contract here makes provision for no warranties by the seller, other than warranty of title, states that "Buyer shall purchase and pay for Buyer's requirements of gaseous oxygen," and provides for the terms of payment "for all oxygen purchased hereunder

***.'' These few examples of contract terminology are sufficient to indicate that the parties plainly intended to sell and buy gaseous oxygen. Thus we conclude that a product was transferred from seller to buyer here just as it was in *Keystone,* and is subject to taxation here as it was in *Keystone.*

■ Northwestern urges us to make a factual distinction on the basis that here the oxygen plant was totally automatic and activated solely by Northwestern employees within the Northwestern plant. Neither the briefs nor opinion in *Keystone* give any indication whether the Chemetron plant was similarly automatic. However, we cannot agree that such a distinction would be valid even if it were existant. Northwestern is contending, in effect, that a manufacturer who constructs, owns, and maintains a production plant on leased property does not own the product produced and stored in that plant solely because the production and delivery systems are designed to operate automatically. We believe that advances in modern technology which permit automated operations should not be permitted to defeat traditional concepts of ownership of property. We note that Union Carbide installed meters to measure the amount of oxygen supplied to plaintiff, and it billed Northwestern on the basis of cubic footage furnished. Accordingly, we hold that a taxable transfer of property from Union Carbide to Northwestern took place under the terms of the 1971 agreement.

■ The final issue presented by Northwestern is identical to another issue decided in *Keystone:* was the monthly facility paid by Northwestern to Union Carbide a rental payment for use of the oxygen supply plant, and thus not subject to the use tax, or was it a part of the purchase price of the oxygen and thus taxable. In *Keystone* the identical arrangement was held to include the facility charge as a part of the cost of transfer of oxygen and nitrogen. According to the briefs from the *Keystone* appeal, the terms of the contract in *Keystone* provided that the facility charge was to be paid monthly whether oxygen and nitrogen were supplied or not. Thus, contrary to Northwestern's argument before this court, *Keystone* is not distinguishable on the ground that the contract here provides for payment even in months when no oxygen is supplied.

In *Keystone,* we considered the statutory language of section 2 of the Use Tax Act (Ill. Rev. Stat. 1975, ch. 120, par. 439.2), which stated that the selling price (which is the measure of tax liability) "shall be determined without any deduction on account of the cost of the property sold, the cost of materials used, labor or service cost or any other expense whatsoever ***.'' Then we stated:

"The plain language of the statute is clear. No reimbursement of any of the seller's expenses whatsoever may be deducted from the selling price in computing use tax liability. In construing section 2, the supreme court has said, 'These words are all-embracing in their scope.' (*Vause & Striegel, Inc. v. McKibbin* (1942), 379 Ill. 169, 172, 39 N.E.2d 1006, 1008.) Here the facility and storage charges are for the purpose of compensating Chemetron for some of the costs of producing and storing the oxygen and nitrogen supplied to Keystone. Under the statute, these charges are a part of the selling price." (*Keystone Consolidated Industries, Inc. v. Allphin* (1977), 45 Ill. App. 3d 714, 719, 359 N.E.2d 1202, 1205.)

We believe that holding controls in this case.

Northwestern argues that it would make no sense to say that the facility charge is a charge for the transfer of gaseous oxygen in a month when no oxygen is used by Northwestern, and further that in a month of small usage, the cost per cubic foot of the cubic feet used would be greater than in other months. According to the audit by the Department of Revenue, gaseous oxygen was supplied to Northwestern in every month of the period involved in this appeal, so the question concerning months of no use is really a hypothetical question. Northwestern emphasizes that its plant was closed down during some of the time covered by the 1975 contract and the facility charge was paid for those months. However, Northwestern is not disputing its tax liability for those months, so we do not see how the subsequent shutdown is relevant to the 1971 contract at issue here. Furthermore, we think the difference in per cubic foot charge for the sale of smaller quantities is not an unusual commercial practice.

Finally, to hold that the facility charge is not a part of the purchase price would mean that the first 20,000,000 cubic feet transferred each month were delivered free of charge and not taxable at all since the contract provided for no charge other than the facility charge for the first 20,000,000 cubic feet of oxygen used. We cannot condone such a tax avoidance scheme.

Having concluded that *Keystone* is controlling as to all the issues presented by Northwestern, we affirm the judgment of the circuit court of Whiteside County.

Affirmed.

SCOTT and HEIPLE, JJ., concur.